841 A.2d 478

IN THE MATTER OF THE INVESTIGATION OF THE ALLEGED AGGRAVATED SEXUAL ASSAULT OF A.S.

Superior Court of New Jersey
Appellate Division

Argued January 12, 2004—Decided February 9, 2004.

Before Judges NEWMAN, FALL and PARRILLO.

*Patrick J. Grimes* argued the cause for appellant, T.G. (*Grimes & Grimes,* attorneys; *Mr. Grimes,* on the brief).

*Paul D. Colangelo,* Senior Assistant Prosecutor, argued the cause for respondent, State of New Jersey (*Sean F. Dalton,* Gloucester County Prosecutor, attorney; *Mr. Colangelo,* on the brief).

The opinion of the court was delivered by

FALL, J.A.D.

This is an appeal from the Law Division's grant of the State's application, pursuant to *Rule* 3:5A, for investigative detention of T.G. and the taking of a buccal swab sample to identify T.G.'s DNA for use in connection with the State's continuing investiga-

tion of the alleged aggravated sexual assault of A.S. The factual and procedural history relevant to our consideration of the arguments advanced by the parties follows.

On or about April 8, 2003, the State filed a motion in the Law Division seeking an order requiring T.G. to submit to investigative detention pursuant to *Rule* 3:5A for the purpose of the taking of exemplars in the form of buccal swabbing to obtain a saliva sample from T.G. for DNA analysis. The State's application was solely supported by the April 8, 2003 certification of Senior Assistant Prosecutor Paul D. Colangelo, which contained the following information.

On June 14, 2002, A.S., K.B., K.J., and J.T. arrived at the Franklin Township home of T.G. to use his pool and spa. T.G. gave A .S. an alcoholic drink. At some point, T.G. and A.S. were in the house together. An investigation by Detective Ken Crescitelli of the Franklin Township Police Department disclosed that A.S. contended that after she had used the bathroom she found T.G. standing outside the bathroom door; that T.G. kissed her and she kissed him back; that she recalled a strange smell on T.G.'s breath and, upon inquiry, T.G. asked A.S. "if she wanted some[;]" and that she then blacked out. Detective Crescitelli learned from A.S. that she believed she had been sexually assaulted inside the residence of T.G. A.S. told Detective Crescitelli "that she recalled laying on a bed, that it was very dark, that she was sitting on a floor by a closet, and that she did not remember anything about how she got there." Mr. Colangelo's certification related the following additional information:

6. A.S. then remembered sitting on a sofa and a friend coming in and saying that the others at the gathering had been looking all over for her. She next remembered getting sick and vomiting.

7. A.S. remembered that her rings were missing. She told Det. Crescitelli that [T.G.] gave them to a friend. She told Det. Crescitelli that she was told by this friend that [T.G.] pulled some type of vial out of his pocket, but that she, the friend, was not sure what it was.

8. Det. Crescitelli asked A.S. if she remembered being sexually assaulted. A.S. replied she did not know and that she was not sure what happened.

9. A.S. submitted to a sexual assault examination. In addition, A.S. submitted blood and urine samples to test for the presence of any drugs.

10. On August 6, 2002, a certified laboratory report from the toxicological analysis completed on A.S.'s urine sample revealed the presence of benzoylecgonine, a metabolite for cocaine. Det. Crescitelli learned from the husband of A.S. that [T.G.] admitted to him in the past that he used cocaine.

11. On December 9, 2002, the New Jersey State Police Central Regional Laboratory published a report of its analysis of the sexual assault examination kit obtained from A.S. A.S.'s panties and vaginal swabs obtained from A.S. tested positive for the presence of spermatozoa. Raymond T. Klama, Sr. Forensic Scientist, requested the Franklin Township P.D. to submit a buccal control from [T.G.]

12. On or about June 19, 2002, Det. Crescitelli was contacted by A.S.'s husband. This individual told Det. Crescitelli that he had two conversations with [T.G.] over the telephone. First, the husband reported, [T.G.] stated that he had no contact with A.S. After being told by A.S.'s husband that A.S. had undergone a sexual assault examination, [T.G.] told A.S.'s husband that A.S. came on to him, that they started having sexual intercourse, but stopped before they were finished. A.S.'s husband told Det. Crescitelli that [T.G.] said that no evidence of DNA would be found. A.S.'s husband further related to Det. Crescitelli that [T.G. stated] that his wife performed oral sex on him against his wishes but that that she forced herself on him.

T.G. retained counsel and filed objecting papers to the State's motion on April 15, 2003. T.G. contended the State had failed to submit affidavits from A.S., her husband, or from Detective Crescitelli to establish the following prerequisite grounds outlined in *Rule* 3:5A–4 for investigative detention: (a) a crime has been committed and is under active investigation; (b) there is a reasonable and well-grounded basis to conclude T.G. may have committed the crime; (c) the results of the physical characteristics obtained during the detention will significantly advance the investigation and determine whether or not T.G. probably committed the crime; and (d) that the physical characteristics cannot otherwise be practicably obtained.

Affidavits were also submitted by T.G. from K.J. and J.T., the other attendees at the June 14, 2002 social gathering. K.J. and J.T. contended that A.S. had been complaining to them about her marriage and had solicited sex from T.G. C.G., T.G.'s wife, also submitted an affidavit stating that A.S. had initiated a sexual encounter with her husband. Accompanying T.G.'s opposing pa-

pers was an affidavit from Dr. D.S., T.G.'s father-in-law, who stated that, medically, spermatozoa may survive and be detected up to fourteen days and that, therefore, the spermatozoa discovered may be that of A.S.'s husband.

The State's motion was argued in the Law Division on May 2, 2003. On May 14, 2003, the motion judge issued a written decision, finding there was a reasonable and well-based suspicion to believe that T.G. may have committed a crime. In addressing the procedural arguments advanced by T.G., the judge stated, in pertinent part:

> The defense further argues that the State has failed to meet the procedural dictates of the Rule because no affidavits were submitted as required by Rule 1:6–6. The Court finds that in this matter the certification submitted is the functional equivalent of an affidavit. As to the personal knowledge requirement, the Court must consider the nature of the proceeding when applying the Rule. The certification must contain sufficient information which meets the requirements of Rule 3:5A that there is a "reasonable and well-grounded basis from which to believe that the person sought has committed the crime," as well as the fact that a "crime has been committed and is under active investigation." A prosecutor's certification as to the nature of the investigation and the facts available to him/her at that time is sufficient for that purpose. The Court must then review that information to determine whether the tests established have been met.

The judge granted the motion and entered an order on May 14, 2003, permitting investigative detention of T.G. for taking the buccal swab sample for DNA testing.

On appeal, T.G. submits the following argument for our consideration:

> THE TRIAL COURT ERRED IN ORDERING THE DETENTION OF APPELLANT PURSUANT TO RULE 3:5A–4 WHERE THE STATE FAILED TO ESTABLISH ALL FOUR PREREQUISITES OF THE RULE AND WHERE IT FAILED TO PROVIDE AFFIDAVITS AS REQUIRED BY RULES 3:5A–2 AND 1:6–6 TO SUPPORT A FACTUAL BASIS FOR THE FINDINGS REQUIRED BY THE RULE 3:5A–4.

Our analysis of this argument begins with *State v. Hall*, 93 *N.J.* 552, 559, 461 *A.*2d 1155, *cert. denied*, 464 *U.S.* 1008, 104 *S.Ct.* 526, 78 *L.Ed.*2d 709 (1983), where the Court ruled

> that the Superior Court has jurisdiction to authorize investigative detentions. This power to authorize investigative detentions is properly founded upon the judiciary's constitutional authority governing searches and seizures, *N.J. Const.* (1947), Art. I,

par. 7 and *U.S. Const.*, Amend IV. When this jurisdiction is invoked, it triggers the judicial responsibility to assess the need advanced by law enforcement for such procedures and to protect the rights of individuals to be free from unreasonable searches and seizures.

[Footnote omitted.]

The Court explained that no probable cause in the traditional sense is necessary to obtain court authorization where the proposed investigative detention does not entail significant intrusion upon individual privacy or freedom and can be effected without abuse, coercion or intimidation. *Id.* at 561, 461 A.2d 1155. Therefore, "an evidential finding of probable cause to believe that a particular individual has committed a crime is not an absolute prerequisite for judicial authorization of an investigatory detention." *Id.* at 561–62, 461 A.2d 1155. The Court then outlined the evidential criteria for authorizing an investigatory detention, as follows:

We are satisfied that a court has jurisdiction to authorize an investigatory detention under the following limited circumstances. The court's authorization of an investigatory detention must, first, be based upon sufficient evidence to demonstrate that a particular crime has occurred, that the crime is unsolved and that it is under active investigation. Second, the police must demonstrate a reasonable and well-grounded basis to believe that the individual sought as the subject of the investigative detention may have committed the crime under investigation. Additionally, it must be shown that the results of the detention will significantly advance the criminal investigation and will serve to determine whether or not the suspect probably committed the crime. Further, it must also appear that these investigative results cannot otherwise practicably be obtained.

[*Id.* at 562, 461 A.2d 1155; footnote omitted.]

In addition to those evidential standards, the Court addressed the issue of appropriate procedural safeguards, as follows:

In order to safeguard constitutional interests and secure the overall reasonableness of such nontestimonial identification procedures, the conduct of investigatory detentions must be carefully circumscribed by other procedural protections. . . . As a result, in order to guarantee that the detention and accompanying intrusion is not improper or abusive, it must be accomplished in a fashion designed to produce the least amount of harassment of, interference with, or prejudice to the suspect. . . . Further, in most cases, the suspect must be given sufficient notice of the proposed detention. . . . The suspect should also be given the opportunity to arrange a convenient time for the detention. . . . In addition, unusual or untoward consequences to the suspect resulting from the detention should be avoided or minimized.

\* \* \* \*

In our view, these procedural requirements, in conjunction with the evidential standard, represent a proper balancing of the public interest in effective law enforcement and the liberty and privacy interests of the individual under the federal and State constitutions.

[*Id.* at 564–66, 461 *A*.2d 1155; citations and footnotes omitted.]

In concluding that the issue of investigative detention is one that merits comprehensive consideration, the Court directed its Criminal Practice Committee to consider the subject of investigative detentions and recommend rules and guidelines governing such detentions. *Id.* at 567, 461 *A*.2d 1155.

Pursuant to the Court's instructions in *Hall,* the Supreme Court Criminal Practice Committee issued a report, making specific recommendations for adoption of rules on the subject of investigative detention. *See Report Of The Supreme Court's Committee on Criminal Practice,* 113 *N.J.L.J.* Index Page 697 (Jun. 21, 1984). *Rules* 3:5A–1 to –9 were adopted by the Supreme Court, effective September 10, 1984.

*Rule* 3:5A–2 provides that the application by the State "shall contain *affidavits* forming a factual basis for the required findings by *R.* 3:5A–4." (Emphasis added). In delineating the grounds for issuance of an order for investigatory detention and compelling a person to submit to non-testimonial identification procedures, *Rule* 3:5A–4 provides, as follows:

An order for investigative detention shall be issued only if the judge concludes from the application that:

(a) a crime has been committed and is under active investigation, and

(b) these is a reasonable and well-grounded basis from which to believe that the person sought may have committed the crime, and

(c) the results of the physical characteristics obtained during the detention will significantly advance the investigation and determine whether or not the individual probably committed the crime, and

(d) the physical characteristics sought cannot otherwise practicably be obtained.

In adopting *Rule* 3:5A, the Court "meticulously struck a fine balance between the State's interest in pursuing criminal investigations and the constitutionally protected privacy, liberty, and personal integrity interests of all citizens upon whom criminal

investigations might focus." *State v. Rolle,* 265 *N.J.Super.* 482, 486, 627 *A.*2d 1157 (App.Div.), *certif. denied,* 134 *N.J.* 562, 636 *A.*2d 520 (1993). Clearly, the four-part showing contained in *Rule* 3:5A–4 must be made before an investigative detention order may issue. *Ibid.*

Citing to *Rule* 3:5A–2 and *Rule* 1:6–6, T.G. argues that the State's application was procedurally defective because a "certification" as opposed to an "affidavit" was filed in support thereof. *Rule* 1:4–4(b) specifically permits the filing of a certification "in lieu of the affidavit, oath or verification required by these rules," if accompanied by a statement preceding the affiant's signature stating that "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment."

▪ *Rule* 1:4–4(b) was adopted as part of the 1969 revisions to the Rules, and was therefore in effect at the time *Rule* 3:5A was adopted in 1984, with its procedural requirement of "affidavits forming a factual basis for the findings required by *R.* 3:5A–4." *Rule* 3:5A–2. Moreover, it is apparent that this requirement of "affidavits" parallels the requirement of *Rule* 3:5–3 that an affidavit or testimony be provided prior to issuance of a search warrant. Both an application for a search warrant and one for investigative detention constitute requests for court-sanctioned privacy intrusions to allow the gathering of evidence of criminality. Our research discloses no authority for the proposition that a certification would be sufficient to form the basis for issuance of a search warrant. Accordingly, we are not persuaded that *Rule* 1:4–4(b) permits the filing of a certification in lieu of an affidavit to support an application for investigative detention.

▪ T.G. also argues that the Colangelo certification is deficient because it is not "made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify[,]" *Rule* 1:6–6, and thereby the information contained thereon cannot constitute a sufficient "factual basis for the findings required by" *Rule* 3:5A–4. In *Hall, supra,* the Court

concluded that the proofs necessary for issuance of an order requiring investigative detention need not rise to the level of "probable cause." 93 *N.J.* at 562–63, 461 *A.*2d 1155. Rather, the court must determine whether the request for investigative detention is reasonable and satisfies the four-part showing required by *Rule* 3:5A–4. *Rolle, supra,* 265 *N.J.Super.* at 486–87, 627 *A.*2d 1157.

It is clear that "hearsay is an adequate basis for finding probable cause and the issuance of a [search] warrant, so long as there are facts which give the statement an appearance of trustworthiness[,]" *State v. DiRienzo,* 53 *N.J.* 360, 385, 251 *A.*2d 99 (1969). We could hardly be expected to impose a greater standard when analyzing the adequacy of affidavits submitted in support of an application for investigative detention, particularly in light of the Court's conclusion in *Hall* that the basis for an investigative detention order need not rise to the level of probable cause. Beyond the fact that it is not in affidavit form as required by the Rule, we are further troubled by two aspects of the Colangelo certification. First, it is riddled with double-and triple-hearsay, eroding the principle enunciated in *Hall, supra,* that investigative detentions be constitutionally permissible "under a 'narrowly defined' set of circumstances[.]" 93 *N.J.* at 561, 461 *A.*2d 1155. Second, the officer conducting the investigation was Detective Crescitelli, who had spoken with A.S., her husband, and others, and who could best reflect the factual basis that would underpin the court's findings on the grounds enumerated in *Rule* 3:5A–4 for consideration of the issuance of an order for investigative detention.

We are mindful that an affidavit executed by Criscetelli or any other investigating officer embodying the substantive content of Colangelo's certification may provide an adequate basis for the findings by the trial court that the State had established each of the grounds set forth in *Rule* 3:5A–4 for issuance of an order for investigative detention. However, we cannot condone the procedure employed in this application, and we are constrained to

reverse and remand for further proceedings consistent with this opinion. A further application by the State must follow the procedural dictates set forth in *Rule* 3:5A–2 in a manner that provides the trial court with a proper factual basis for the findings required by *Rule* 3:5A–4.

Reversed and remanded.